## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| KLAY ANDERSON, MIKLOS BONA, DHRUV DESAI, LOVE SHAH, MARK SOROSIAK, and ROBERT WILLIAMS, individually and on behalf of all others similarly situated, | Case No. <br><br> **CLASS ACTION COMPLAINT** <br><br> **JURY TRIAL DEMANDED** |
| Plaintiffs, | |
| v. | |
| DOW JONES & COMPANY, INC., | |
| Defendant. | |

Plaintiffs Klay Anderson, Miklos Bona, Dhruv Desai, Love Shah, Mark Sorosiak, and Robert Williams (collectively, "Plaintiffs"), individually and on behalf of all other similarly situated persons, by and through their attorneys, make the following allegations pursuant to the investigation of their counsel and based upon information and belief, except as to allegations specifically pertaining to themselves and their counsel, which are based on personal knowledge.

## <u>NATURE OF THE ACTION</u>

1.     This is a class action brought on behalf of all persons with Facebook accounts who had a subscription with *The Wall Street Journal* during the time *The Wall Street Journal* utilized the Meta Pixel technology (discussed *infra*).

2.     Dow Jones & Company, Inc. ("Dow Jones" or "Defendant") publishes *The Wall Street Journal*, a digital and print newspaper providing articles and videos on business and financial news. *The Wall Street Journal* platform allows customers to access news articles and video content through wsj.com (the "Website").

3.    Dow Jones monetizes *The Wall Street Journal* through subscriptions to view news articles and videos on the Website.

4.    Dow Jones knowingly collects and discloses its purchasers' personally identifiable information—including a record of every video watched on the website—to Facebook without proper consent.

5.    The Video Privacy Protection Act ("VPPA") generally prohibits the knowing disclosure of a customer's video rental or sale records without the informed, written consent of the customer in a form "distinct and separate from any form setting forth other legal or financial obligations." 18 U.S.C. § 2710(b)(2)(B)(i).

6.    In 1988, Congress enacted the VPPA aiming to confer to consumers the power to "maintain control over personal information divulged and generated in exchange for receiving services from video tape service providers." S. Rep. No. 100-599, at 8. "The Act reflects the central principle of the Privacy Act of 1974: that information collected for one purpose may not be used for a different purpose without the individual's consent." *Id.*

7.    Dow Jones violated, and upon information and belief continues to violate, the VPPA through its practice of knowingly disclosing to a third party, Meta Platforms, Inc. ("Facebook" or "Meta"), data containing Plaintiffs' and putative class members' personally identifiable information ("PII") and Facebook ID ("FID")—including a record of videos watched on the website—without first providing clear and conspicuous notice to the account holders and receiving consent.

## **PARTIES**

8.    Plaintiff Klay Anderson is, and has been at all relevant times, a resident of Holladay, Utah.

9.      Plaintiff Miklos Bona is, and has been at all relevant times, a resident of Gainesville, Florida.

10.     Plaintiff Dhruv Desai is, and has been at all relevant times, a resident of Hoboken, New Jersey.

11.     Plaintiff Love Shah is, and has been at all relevant times, a resident of Oak Park, Illinois.

12.     Plaintiff Mark Sorosiak is, and has been at all relevant times, a resident of New Milford, Connecticut.

13.     Plaintiff Robert Williams is, and has been at all relevant times, a resident of Glen Ridge, New Jersey.

14.     Defendant Dow Jones & Company, Inc. is a Delaware Corporation with an office at 1211 Avenue of the Americas, New York, NY 10036. Defendant develops, owns, and operates wsj.com, which is used throughout New York and the United States.

## JURISDICTION AND VENUE

15.     This Court has subject matter jurisdiction under 28 U.S.C. § 1331 over this action because it arises under the law of the United States, specifically the Video Privacy Protection Act, 18 U.S.C. § 2710.

16.     This Court has personal jurisdiction over the parties because Defendant has continuously and systematically conducted business in the State of New York. Likewise, Plaintiffs' rights were violated in the State of New York as a result of their contact with Defendant from and within New York.

17.     Venue is proper in this Court pursuant to 28 U.S.C. §1391 because a substantial part of the events or omissions giving rise to the claim occurred in this district. Moreover, venue

is also proper in this Court because the Dow Jones Terms of Use, located on its Website, state that "The sole jurisdiction and venue for . . . any other claim that otherwise proceeds in court, will be an appropriate federal or state court with proper jurisdiction located in the County of New York in the State of New York."

## FACTUAL BACKGROUND

### A.  The Video Privacy Protection Act.

18.    Initially passed in 1988, the VPPA was designed to protect the privacy of individuals and their families by preventing unauthorized disclosure of their video rental, purchase, and viewing history. In proposing the Video and Library Privacy Protection Act, later codified as the VPPA, Senator Leahy stated that "[i]n practical terms our right to privacy protects the choice of movies that we watch with our family in our own homes. And it protects the selection of books that we choose to read." 134 CONG. REC. S5399 (daily ed. May 10, 1988). Thus, the personal nature of such information and the necessity to protect it from disclosure is the inspiration of the statute: "[t]hese activities are at the core of any definition of personhood. They reveal our likes and dislikes, our interests, and our whims. They say a great deal about our dreams and ambitions, our fears and our hopes. They reflect our individuality, and they describe us as people." *Id.*

19.    While these statements rang true in 1988, when the VPPA was passed, the importance of legislation like the VPPA is more pronounced today, in the era of data mining from online activities.

20.    In 2012, Congress amended the VPPA and, in so doing, reiterated the Act's applicability to "so-called 'on-demand' cable services and Internet streaming services [that] allow consumers to watch movies or TV shows on televisions, laptop computers, and cell phones." S. Rep. 112-258, at 2.

21.     During a 2012 Senate Judiciary Committee meeting, "The Video Privacy Protection Act: Protecting Viewer Privacy in the 21st Century," Senator Leahy emphasized the point by stating: "While it is true that technology has changed over the years, we must stay faithful to our fundamental right to privacy and freedom. Today, social networking, video streaming, the 'cloud,' mobile apps, and other new technologies have revolutionized the availability of Americans' information."[1]

22.     The VPPA prohibits "[a] video tape service provider who knowingly discloses, to any person, personally identifiable information concerning any consumer of such provider." 18 U.S.C. § 2710(b)(1).

23.     The VPPA defines personally identifiable information as "information which identifies a person as having requested or obtained specific video materials or services from a video service provider." 18 U.S.C. § 2710(a)(3).

24.     A videotape service provider ("VTSP") is "any person, engaged in the business, in or affecting interstate or foreign commerce, of rental, sale, or delivery of prerecorded video cassette tapes or similar audio visual materials." 18 U.S.C. § 2710(a)(4). A consumer is "any renter, purchaser, or subscriber of goods or services from a video tape service provider[.]" 18 U.S.C. § 2710(a)(1).

25.     The VPPA also prohibits the disclosure of PII, which identifies the title or description of the audio-visual material for marketing goods and services. 18 U.S.C. § 2710(b)(2)(D)(ii).

---

[1] *The Video Privacy Protection Act: Protecting Viewer Privacy in the 21st Century: Hearing Before the Subcomm. on Privacy, Tech. & the Law of the S. Comm. on the Judiciary*, 112th Cong. 1 (2012), https://www.judiciary.senate.gov/meetings/the-video-privacy-protection-act-protecting-viewer-privacy-in-the-21s-century (last visited Dec 17, 2024).

26.    The VPPA covers "prerecorded video cassette tapes or similar audio visual materials," *see* 18 U.S.C. § 2710(a)(4), and Congress intended that to include a broad category of audio visual materials, including "laser discs, open-reel movies, or CDI technology" *see* S. Rep. 100-599), digitally streamed "video clips[,]" and video game cutscenes. *See Aldana v. GameStop, Inc.*, 2024 U.S. Dist. LEXIS 29496, at *17-18, 19 (S.D.N.Y. Feb. 21, 2024).

27.    VTSPs may obtain consent from consumers to disclose information where that consent: (1) is in a form distinct and separate from any form setting forth other legal or financial obligations of the consumer; (2) at the election of the consumer in advance of up to 2 years or when the disclosure is sought; and (3) if the VTSP provided the consumer with a clear and conspicuous opportunity to withdraw consent on a case-by-case basis or withdraw from ongoing disclosures at the consumer's election. 18 U.S.C. § 2710(b)(2)(B)(i)–(iii).

28.    Under the statute, for each violation, a court may award actual damages (but not less than liquidated damages of $2,500.00 per person), punitive damages, equitable relief, and attorney's fees.

29.    Dow Jones is a VTSP that sold or provided access to pre-recorded audio-visual materials to PII Users, including Plaintiffs and Class Members, on its website.

**B. The Meta Tracking Pixel.**

30.    Facebook is the largest social networking site, with approximately 3.0 billion monthly active users.[7] Facebook's policy requires users to go by "the name they go by in everyday life" to sign up as a user.[8] To that end, users are required to provide their first and last name,

---

[7] *Facebook has 3 Billion Users. Many of Them are old,* CBS NEWS (May 8, 2023) https://www.cbsnews.com/news/facebook-users-3-billion-users-zuckerberg/.
[8] Meta Transparency Center, *Authentic Identity Representation*, META, https://transparency.meta.com/policies/community-standards/authentic-identity-representation (last visited April 17, 2025).

birthday, gender, and mobile number or email.[9] Facebook surveils its users' activity both on and

off its site, allowing it to make inferences about users beyond what they explicitly disclose to the

website.[10] Facebook uses this data to advertise products and services to its users.

31.     Facebook generates the bulk of its revenue by selling targeted advertising space on

its website.[11] Advertisers are able to use precise filters and parameters for their targeted

advertisements based on the information collected by Facebook. Facebook uses website or app

traffic to allow advertisers to build "Custom Audiences, "an ad targeting option that lets you find

your existing audiences among people."[12] Through Custom Audiences, advertisers can target

existing customers directly, or they can use it to build a "lookalike audience," which "leverages

information such as demographics, interests, and behavior from [their] source audience to find

new people who share similar qualities."[13]

32.     Custom Audiences require an advertiser to supply the underlying data to Facebook.

They can do so through two mechanisms: manually uploading contact information for customers

or utilizing one of Facebook's business tools, such as Meta Pixels.[14]

33.     Meta Pixels are codes that advertisers can integrate into their websites. Once

integrated, the Meta Pixel "tracks the people and types of actions they take" while on the

advertiser's website.[15] The Meta Pixel can be configured to automatically collect IP addresses,

---

[9] Facebook, *Sign Up*, META, https://www.facebook.com/ (last visited Dec. 17, 2024).

[10] Business Help Center, *About Meta Pixel*, META, https://www.facebook.com/business/help/742478679120153?id=1205376682832142 (last visited April 17, 2025).

[11] Mike Isaac, *Facebook's Profit Surges 101 Percent on Strong ad Sales.*, N.Y. Times, July 28, 2021, https://www.nytimes.com/2021/07/28/business/facebook-q2-earnings.html.

[12] Business Help Center, *About Custom Audiences*, META, https://www.facebook.com/business/help/744354708981227?id=2469097953376494 (last visited April 17, 2025).

[13] Business Help Center, *About Lookalike Audiences*, META, https://www.facebook.com/business/help/164749007013531?id=401668390442328 (last visited April 17, 2025).

[14] Business Help Center, *Create a Customer List Custom Audience*, META, https://www.facebook.com/business/help/170456843145568?id=2469097953376494 (last visited April 17, 2025).

[15] Facebook Business, *How Does Retargeting Help Your Business*, META, https://www.facebook.com/business/goal

information about the web browser, and the person using the website.[16] When the Meta Pixel captures an action, it sends a record to Facebook. Once this record is received, Facebook processes, analyzes, and assimilates it into its datasets.

### C.  Facebook ID.

34.    Facebook ID ("FID") is a unique and persistent identifier that Facebook assigns to each user. A FID is personally identifiable information. Anyone can identify a Facebook profile – and all personal information publicly listed on that profile—by appending the Facebook ID to the end of "www.Facebook.com." As Facebook itself explains, any ordinary person can look up the user's Facebook profile and name by using the FID:[17]

**User ID**

Your User ID is a string of numbers that doesn't personally identify you but does connect to your Facebook profile. You have a User ID automatically, whether or not you choose to create a username. Learn how to find your user ID.

User IDs can:

- Allow someone with the ID to see your profile, including any public information. Learn how to adjust what people can see in your profile.

- Help other applications personalize your experience by connecting with your Facebook account. When you allow apps to connect with your Facebook account, they can use your user ID to see public information, like your public profile and your friend list.

- When you run into issues with an app or game, your User ID can help the developer better investigate the problem to understand and address your specific concerns.

35.    When a Facebook subscriber watches a video on *The Wall Street Journal* website, the title of the video, the URL, and the subscriber's FID are transmitted to Facebook through the Meta Tracking Pixel. Below is an example of the process for watching a video titled *Why Hydrogen Flight is Both Here and Decades Away* on *The Wall Street Journal* Website:

---

s/retargeting (last visited April 17, 2025).

[16] Meta for Developers, *Meta Pixel*, META, https://developers.facebook.com/docs/meta-pixel (last visited April 17, 2025).

[17] Facebook Help Center, *Your Username*, META, https://www.facebook.com/help/1740158369563165 (last visited April 17, 2025).



36.     By compelling a user's Internet browser to disclose data relating to videos, Dow Jones knowingly discloses information that sufficiently allows an ordinary person to identify what videos a specific individual has watched.

37.     The aforementioned allows Dow Jones to optimize its ads and build Custom Audiences for future ads. This transmission is not the subscriber's decision, but results from Dow Jones' use and incorporation of the Meta Tracking Pixel into its Website.

38.     Notably, Dow Jones could easily program its Website to prevent its account holders' user data and PII from being automatically transmitted to Facebook when an account holder uses its Website. However, it is not in Dow Jones' financial interest to do so because it benefits financially by providing this highly sought-after information to Facebook and other third parties. As a result of its data compiling and sharing practices, Dow Jones has knowingly disclosed to Facebook its account holders' PII and personal video viewing information in violation of the VPPA.

39.     Dow Jones maintains a vast digital database comprised of its account holders' user data and PII, including the email addresses of each account holder and information reflecting the video content each of its subscribers watched. The data that Dow Jones discloses to Facebook is also tied to the account holders' unique FID. This allows Facebook to build from scratch or add to the trove of data it already has in its detailed profiles of its users. Importantly, this disclosure is made without the consent of *The Wall Street Journal* subscribers and to the detriment of the subscribers' legally protected privacy rights.

40.     Additionally, upon information and belief, Dow Jones also uploads customer lists to Facebook that contain subscribers' email addresses and other information, including what videos they watched. Upon information and belief, Dow Jones uploads these lists for the purpose of Facebook matching *The Wall Street Journal*'s subscribers to their Facebook profiles. Upon information and belief, these customer lists must contain identifiers such as email, phone number, and address, which Facebook then matches to Facebook profiles so that advertisers can advertise to their customers on Facebook and Meta's other social media platforms.

**D. *The Wall Street Journal* Account Sign-Up Process and Privacy Policy.**

41.     As explained *supra*, Dow Jones is a company that publishes *The Wall Street Journal*, a digital and print newspaper providing articles and videos on business and financial news. *The Wall Street Journal* platform allows customers to access news articles and video content through *The Wall Street Journal* website. Dow Jones monetizes *The Wall Street Journal* through subscriptions with an account to view news articles and videos on *The Wall Street Journal*'s website. To sign up for *The Wall Street Journal*'s website, a customer must provide their personal information, including their name and email address.

42.     Notably, once account holders sign up to view videos on *The Wall Street Journal*'s website, they are not notified – consistent with the VPPA – that their User Data and PII are being shared with a third party. Additionally, Dow Jones does not provide its account holders with an opportunity, in a clear and conspicuous manner, to withdraw on a case-by-case basis from the ongoing disclosure of their User Data and PII.

43.     Upon clicking the "subscribe" button, a user is taken to a subsequent page where they can first select their subscription plan. After selecting a subscription plan, the user is taken to another page where they provide their name, email address, and create a password. Once that information is filled in, the user is prompted to click the blue "Continue" button on the page. The user is then taken to additional pages to select their payment method, add their billing address, and provide payment details. Once the user has entered their payment information, they are prompted to click on the blue "Purchase" button on the page. At the bottom of this page, in fine print, is a disclaimer stating, "By clicking on the "PURCHASE" button below, you agree to the Terms of Use for *The Wall Street Journal*, including the Cancellation Policy contained therein, Privacy Notice and Cookie Notice."

44.     When subscribing, the Privacy Policy terms are not disclosed "in a form distinct and separate from any form setting forth other legal or financial obligations of its [subscribers]" and do not obtain consent to share *The Wall Street Journal*'s account holders' User Data and PII with third parties such as Facebook. Therefore, *The Wall Street Journal*'s sign-up process fails to provide reasonably conspicuous notice of the terms to which the consumer will be bound.

**E.  Experience of Plaintiff Klay Anderson.**

45.     Plaintiff Klay Anderson had a subscription with *The Wall Street Journal* within the past 2 years. Plaintiff Klay Anderson became a subscriber of *The Wall Street Journal* by providing,

amongst other things, his email address and credit card information. Plaintiff Klay Anderson had a Facebook account at all relevant times. Proof of Plaintiff Klay Anderson's Facebook account is attached to this demand as **EXHIBIT A**.

46.     Plaintiff Klay Anderson watched one or more videos on *The Wall Street Journal* Website using his *The Wall Street Journal* subscription. Proof of Plaintiff Klay Anderson's subscription to *The Wall Street Journal*'s Website is attached to this demand as **EXHIBIT B**.

47.     Plaintiff Klay Anderson was unaware that Dow Jones harvested and shared his user data and PII with Facebook because the Meta Pixel software is inconspicuously embedded in *The Wall Street Journal* Website without proper disclosure or obtaining required consent as mandated by the VPPA.

48.     Plaintiff Klay Anderson had a reasonable expectation of privacy that his user data and PII would not be harvested from *The Wall Street Journal*'s Website or shared with third parties such as Facebook.

49.     Plaintiff Klay Anderson never consented, agreed, authorized, or permitted Dow Jones to disclose his user data or PII to Facebook. Plaintiff Klay Anderson has never been provided with written notice appropriate under the VPPA that Dow Jones discloses its account holders' user data. Dow Jones nonetheless knowingly disclosed Plaintiff Klay Anderson's user data in a fashion that violates the VPPA and other law.

**F.  Experience of Plaintiff Miklos Bona.**

50.     Plaintiff Miklos Bona had a subscription with *The Wall Street Journal* within the past 2 years. Plaintiff Miklos Bona became a subscriber of *The Wall Street Journal* by providing, amongst other things, his email address and credit card information. Plaintiff Miklos Bona had a

Facebook account at all relevant times. Proof of Plaintiff Miklos Bona's Facebook account is attached to this demand as **EXHIBIT C**.

51.     Plaintiff Miklos Bona watched one or more videos on *The Wall Street Journal* Website using his *The Wall Street Journal* subscription. Proof of Plaintiff Miklos Bona's subscription to *The Wall Street Journal*'s Website is attached to this demand as **EXHIBIT D**.

52.     Plaintiff Miklos Bona was unaware that Dow Jones harvested and shared his user data and PII with Facebook because the Meta Pixel software is inconspicuously embedded in *The Wall Street Journal* Website without proper disclosure or obtaining required consent as mandated by the VPPA.

53.     Plaintiff Miklos Bona had a reasonable expectation of privacy that his user data and PII would not be harvested from *The Wall Street Journal*'s Website or shared with third parties such as Facebook.

54.     Plaintiff Miklos Bona never consented, agreed, authorized, or permitted Dow Jones to disclose his user data or PII to Facebook. Plaintiff Miklos Bona has never been provided with written notice appropriate under the VPPA that Dow Jones discloses its account holders' user data. Dow Jones nonetheless knowingly disclosed Plaintiff Miklos Bona's user data in a fashion that violates the VPPA and other law.

**G.  Experience of Plaintiff Dhruv Desai.**

55.     Plaintiff Dhruv Desai had a subscription with *The Wall Street Journal* within the past 2 years. Plaintiff Dhruv Desai became a subscriber of *The Wall Street Journal* by providing, amongst other things, his email address and credit card information. Plaintiff Dhruv Desai had a Facebook account at all relevant times. Proof of Plaintiff Dhruv Desai's Facebook account is attached to this demand as **EXHIBIT E**.

56.    Plaintiff Dhruv Desai watched one or more videos on *The Wall Street Journal* Website using his *The Wall Street Journal* subscription. Proof of Plaintiff Dhruv Desai's subscription to *The Wall Street Journal*'s Website is attached to this demand as **EXHIBIT F**.

57.    Plaintiff Dhruv Desai was unaware that Dow Jones harvested and shared his user data and PII with Facebook because the Meta Pixel software is inconspicuously embedded in *The Wall Street Journal* Website without proper disclosure or obtaining required consent as mandated by the VPPA.

58.    Plaintiff Dhruv Desai had a reasonable expectation of privacy that his user data and PII would not be harvested from *The Wall Street Journal*'s Website or shared with third parties such as Facebook.

59.    Plaintiff Dhruv Desai never consented, agreed, authorized, or permitted Dow Jones to disclose his user data or PII to Facebook. Plaintiff Dhruv Desai has never been provided with written notice appropriate under the VPPA that Dow Jones discloses its account holders' user data. Dow Jones nonetheless knowingly disclosed Plaintiff Dhruv Desai's user data in a fashion that violates the VPPA and other law.

**H.  Experience of Plaintiff Love Shah.**

60.    Plaintiff Love Shah had a subscription with *The Wall Street Journal* within the past 2 years. Plaintiff Love Shah became a subscriber of *The Wall Street Journal* by providing, amongst other things, his email address and credit card information. Plaintiff Love Shah had a Facebook account at all relevant times. Proof of Plaintiff Love Shah's Facebook account is attached to this demand as **EXHIBIT G**.

61.    Plaintiff Love Shah watched one or more videos on *The Wall Street Journal* Website using his *The Wall Street Journal* subscription. Proof of Plaintiff Love Shah's subscription to *The Wall Street Journal*'s Website is attached to this demand as **EXHIBIT H**.

62.    Plaintiff Love Shah was unaware that Dow Jones harvested and shared his user data and PII with Facebook because the Meta Pixel software is inconspicuously embedded in *The Wall Street Journal* Website without proper disclosure or obtaining required consent as mandated by the VPPA.

63.    Plaintiff Love Shah had a reasonable expectation of privacy that his user data and PII would not be harvested from *The Wall Street Journal*'s Website or shared with third parties such as Facebook.

64.    Plaintiff Love Shah never consented, agreed, authorized, or permitted Dow Jones to disclose his user data or PII to Facebook. Plaintiff Love Shah has never been provided with written notice appropriate under the VPPA that Dow Jones discloses its account holders' user data. Dow Jones nonetheless knowingly disclosed Plaintiff Love Shah's user data in a fashion that violates the VPPA and other law.

**I.    Experience of Plaintiff Mark Sorosiak.**

65.    Plaintiff, Mark Sorosiak, had a subscription with *The Wall Street Journal* within the past 2 years. Plaintiff Mark Sorosiak became a subscriber of *The Wall Street Journal* by providing, amongst other things, his email address and credit card information. Plaintiff Mark Sorosiak had a Facebook account at all relevant times. Proof of Plaintiff Mark Sorosiak's Facebook account is attached to this demand as **EXHIBIT I**.

66.     Plaintiff Mark Sorosiak watched one or more videos on *The Wall Street Journal* Website using his *The Wall Street Journal* subscription. Proof of Plaintiff Mark Sorosiak's subscription to *The Wall Street Journal*'s Website is attached to this demand as **EXHIBIT J**.

67.     Plaintiff Mark Sorosiak was unaware that Dow Jones harvested and shared his user data and PII with Facebook because the Meta Pixel software is inconspicuously embedded in *The Wall Street Journal* Website without proper disclosure or obtaining required consent as mandated by the VPPA.

68.     Plaintiff Mark Sorosiak had a reasonable expectation of privacy that his user data and PII would not be harvested from *The Wall Street Journal*'s Website or shared with third parties such as Facebook.

69.     Plaintiff Mark Sorosiak never consented, agreed, authorized, or permitted Dow Jones to disclose his user data or PII to Facebook. Plaintiff Mark Sorosiak has never been provided with written notice appropriate under the VPPA that Dow Jones discloses its account holders' user data. Dow Jones nonetheless knowingly disclosed Plaintiff Mark Sorosiak's user data in a fashion that violates the VPPA and other law.

**J.  Experience of Plaintiff Robert Williams.**

70.     Plaintiff Robert Williams had a subscription with *The Wall Street Journal* within the past 2 years. Plaintiff Robert Williams became a subscriber of *The Wall Street Journal* by providing, amongst other things, his email address and credit card information. Plaintiff Robert Williams had a Facebook account at all relevant times. Proof of Plaintiff Robert Williams's Facebook account is attached to this demand as **EXHIBIT K.**

71.     Plaintiff Robert Williams watched one or more videos on *The Wall Street Journal* Website using his *The Wall Street Journal* subscription. Proof of Plaintiff Robert Williams's subscription to *The Wall Street Journal*'s Website is attached to this demand as **EXHIBIT L**.

72.     Plaintiff Robert Williams was unaware that Dow Jones harvested and shared his user data and PII with Facebook because the Meta Pixel software is inconspicuously embedded in *The Wall Street Journal* Website without proper disclosure or obtaining required consent as mandated by the VPPA.

73.     Plaintiff Robert Williams had a reasonable expectation of privacy that his user data and PII would not be harvested from *The Wall Street Journal*'s Website or shared with third parties such as Facebook.

74.     Plaintiff Robert Williams never consented, agreed, authorized, or permitted Dow Jones to disclose his user data or PII to Facebook. Plaintiff Robert Williams has never been provided with written notice appropriate under the VPPA that Dow Jones discloses its account holders' user data. Dow Jones nonetheless knowingly disclosed Plaintiff Robert Williams's user data in a fashion that violates the VPPA and other law.

**K.  Dow Jones's Arbitration Agreement.**

75.     Dow Jones' Arbitration Agreement is contained within the company's Terms of Use and is part of a standardized clickwrap contract that users are required to accept in full as a requirement of using the Website.

76.     Users have no opportunity to negotiate, modify, or waive specific provisions of the Terms of Use, including the Arbitration Agreement. The Terms are presented in a "one-size-fits-all" fashion, with no room for individualized negotiation.

77.    The Arbitration Agreement requires users to meet conditions before ever beginning arbitration. These requirements include providing written notice of the dispute and participation in a 60-day informal dispute resolution process that Dow Jones can – and has in the past – ignored.

78.    In addition to a burdensome pre-arbitration notice requirement and 60-day dispute resolution process, the arbitration provision includes a mass filing provision that delays the resolution of legitimate claims while other claims are resolved first.

79.    The Arbitration Agreement states that "[a]ll Disputes will be resolved by binding, individual arbitration . . . " As such, a reasonable consumer would understand the promise of "individual arbitration" to mean traditional, bilateral arbitration.

80.    After promising "individual arbitration," Dow Jones' Terms of Use abandons this through its mass arbitration provision which effectively prohibits "individual arbitration" if 25 or more similar claims have been filed within a 180-day period. The language of Dow Jones' mass arbitration provision is set forth below:

**16.4 WAIVER OF MASS ARBITRATION FILINGS.**

You and Dow Jones waive the right to file any Dispute as part of a Mass Arbitration Filing. A "Mass Arbitration Filing" includes instances in which you or Dow Jones are represented by a law firm or collection of firms that has filed 25 or more arbitration demands of a substantially similar nature against the other party within 180 days of the arbitration demand filed on your or Dow Jones's behalf, and the law firm or collection of firms seek to simultaneously arbitrate all arbitration demands. No arbitrator shall arbitrate any Mass Arbitration Filing. If this waiver of Mass Arbitration Filings is deemed unenforceable, neither you nor Dow Jones is entitled to arbitration; instead all Disputes will be resolved in court as noted below and subject to Section 16.3.

81.    By repeatedly promising "individual arbitration," Dow Jones dangles the carrot of informality, speed, and efficiency in front of claimants hoping to resolve their claims. But later in its Terms, Dow Jones completely abandons the informality of bilateral arbitration by denying users the ability to bring individual claims if their claims are in any way similar in nature to others that

have been filed within a 180-day period. This trickery adds to the substantive unconscionability of Dow Jones' Terms of Use.

82.    The limitation on the number of cases arbitrated at once causes delays in resolving individual claims, creating an environment where users are discouraged from pursuing claims due to the extended timeframes and uncertainty about the timely resolution of their disputes.

83.    The mass filing provision effectively provides that remaining claims beyond the initial 25 will not be subject to arbitration. This disadvantages users with small claims, as in VPPA cases, the costs of arbitration exceed the potential recovery, leaving users with no viable means to seek redress. As a result, users are effectively discouraged from pursuing their claims.

84.    Further, the Arbitration Agreement provides an opt-out provision that gives the user's the impression that they have a choice in avoiding arbitration. However, the opt-out provision unfairly requires users to provide written notice of their opt-out within 30 days of becoming subject to the Terms of Use. Users can become subject to the Terms of Use before having the opportunity to read the terms and as a result will be unable to opt-out of the Arbitration Agreement prior to the expiration of the 30 days.

85.    The Arbitration Agreement in Dow Jones' Terms of Use is unconscionable as a matter of law.

## CLASS ALLEGATIONS

86.    Plaintiffs bring this action, on behalf of themselves and all others similarly situated, as a class action pursuant to Federal Rule of Civil Procedure 23(a), (b)(1), and/or (b)(3):

> **Class Definition:** Plaintiffs seek to represent the following Class (members of which are collectively referred to herein as "Class Members"): During the fullest period allowed by law, all natural persons in the United States who had a Facebook account, created an account on wsj.com, had a subscription to *The Wall Street Journal*, and watched videos or other audiovisual content from wsj.com during the time the Meta Tracking Pixel was active on wsj.com, until the date notice is disseminated.

87.     Excluded from the Class are Defendant, its employees, agents and assigns, any members of the judiciary to whom this case is assigned, their respective court staff, the members of their immediate families, and Plaintiffs' counsel.

88.     Subject to additional information obtained through further investigation and discovery, the above-described Class may be modified or narrowed as appropriate, including through the use of multi-state subclasses.

89.     This action has been brought and may be properly maintained as a class action under Federal Rule of Civil Procedure 23 because there is a well-defined community of interest in the litigation, the proposed Class is easily ascertainable, and Plaintiffs are proper representatives of the Class.

90.     **Numerosity:** At this time, Plaintiffs do not know the exact number of Members of the aforementioned Class. However, given the popularity of and user activity on Defendant's Website, the number of persons within the Class is believed to be so numerous that joinder of all Members is impractical.

91.     **Typicality:** Plaintiffs' claims are typical of those of the Class because Plaintiffs, like all members of the Class, watched videos on wsj.com and had their PII collected and disclosed by Defendant.

92.     **Commonality:** Common questions of fact and law exist for all Class Members and predominate over the questions affecting only individual Members of the Class. With respect to the Class Members, these common questions include but are not limited to:

(a) whether Defendant collected Plaintiffs' and the Class's video-related information and PII;

20

(b) whether Defendant unlawfully disclosed and continues to disclose its users' video-related information and PII in violation of the VPPA;

(c) whether Defendant's disclosures were committed knowingly; and

(d) whether Defendant disclosed Plaintiffs' and the Class's video-related information and PII without consent.

93.    **Adequacy of Representation:** Plaintiffs have retained and are represented by qualified and competent counsel who are highly experienced in complex consumer class action litigation, including litigation concerning the VPPA and corresponding state causes of action. Plaintiffs and their counsel are committed to vigorously prosecuting this class action. Moreover, Plaintiffs can fairly and adequately represent and protect the interests of the Class. Neither Plaintiffs nor their counsel have any interest adverse to, or in conflict with, the interests of the absent Members of the Class. Plaintiffs have raised viable statutory claims, or the type reasonably expected to be raised by Members of the Class, and will vigorously pursue those claims. If necessary, Plaintiffs may seek leave of this Court to amend this Class Action Complaint to include additional representatives to represent the Class, additional claims as may be appropriate, or to amend the definition of the Class to address any steps that Defendant took.

94.    **Superiority of the Class Action:** A class action is superior to other available methods for the fair and efficient adjudication of this controversy because individual litigation of the claims of all Members of the Class is impracticable. Even if every Member of the Class could afford to pursue individual litigation, the court system could not. It would be unduly burdensome to the courts in which individual litigation of numerous cases would proceed. Individualized litigation would also present the potential for varying, inconsistent, or contradictory judgments and would magnify the delay and expense to all parties and the court system resulting from

multiple trials of the same factual issues. By contrast, the maintenance of this action as a class action, with respect to some or all of the issues presented herein, presents few management difficulties, conserves the resources of the parties and the court system, and protects the rights of each member of the Class. Plaintiffs anticipate no difficulty in managing this action as a class action.

## CAUSES OF ACTION

### COUNT I
### VIOLATION OF THE VIDEO PRIVACY PROTECTION ACT
### 18 U.S.C. § 2710, *et seq.*

95.    Plaintiffs hereby reallege paragraphs 1 through 94 above as if fully set forth herein.

96.    Plaintiffs bring this claim individually and on behalf of the proposed Class Members against Defendant.

97.    Defendant is a "video tape service provider" because it offers videos and other pre-recorded audiovisual content for viewing on *The Wall Street Journal* website, thereby "engag[ing] in the business, in or affecting interstate or foreign commerce, of rental, sale, or delivery of prerecorded video cassette tapes or similar audio visual materials." 18 U.S.C. § 2710(a)(4).

98.    Plaintiffs and Members of the Class are "consumers" because they purchased subscriptions to *The Wall Street Journal* and have user accounts with *The Wall Street Journal* Website. 18 U.S.C. § 2710(a)(1).

99.    Defendant disclosed to a third party—Facebook (Meta)—Plaintiffs' and putative Class Members' personally identifiable information (i.e., the users' identities).

100.    Defendant utilized the Facebook Tracking Pixel to compel Plaintiffs' (and the putative Class Members') web browser to transfer Plaintiffs' identifying information, like their

22

Facebook ID, along with Plaintiffs' (and the putative Class Members') event data, like the title of videos that were watched or the title of other pre-recorded audiovisual media that was also viewed.

101.    Plaintiffs and the Class Members watched videos from Defendant as well as other pre-recorded audiovisual media.

102.    Defendant knowingly disclosed Plaintiffs' and putative Class Members' personally identifiable information because it used that data to build audiences on Facebook to retarget them for its advertising campaigns.

103.    Plaintiffs and Class Members did not provide Defendant with any form of consent consistent with the VPPA—either written or otherwise—to disclose their PII to third parties.

104.    Defendant's aforementioned disclosures were not made in the "ordinary course of business," as the term is defined by the VPPA. Particularly, Defendant's disclosures to Facebook were not necessary for "debt collection activities, order fulfillment, request processing, [or] transfer of ownership." 18 U.S.C. § 2710(a)(2).

105.    On behalf of themselves and the Class, Plaintiffs seek: (i) declaratory relief; (ii) injunctive and equitable relief as is necessary to protect the interests of Plaintiffs and the Class by requiring the Defendant to comply with VPPA's requirements for protecting a consumer's PII; (iii) statutory damages of $2,500 for each violation of the VPPA pursuant to 18 U.S.C. § 2710(c); and (iv) reasonable attorneys' fees and costs and other litigation expenses.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs seek a judgment against Defendant, individually and on behalf of all others similarly situated, as follows:

(a)  For a determination that this action may be maintained as a class action pursuant to Federal Rules of Civil Procedure Rule 23(a), (b)(1), and/or (b)(3), or, in the alternative, (c)(4) if appropriate;

(b)  For an order certifying the Class, naming Plaintiffs as representatives of the Class, and naming Plaintiffs' attorneys as Class Counsel to represent the Class;

(c)  For an order declaring that Defendant's conduct violates 18 U.S.C. § 2710, *et seq.*;

(d)  For an order finding in favor of Plaintiffs and the Class;

(e)  For an award of statutory damages;

(f)  For punitive damages, as warranted, in an amount to be determined at trial;

(g)  For prejudgment interest on all amounts awarded;

(h)  For injunctive relief as pleaded or as the Court may deem proper; and

(i)  For an order awarding Plaintiffs and the Class their reasonable attorneys' fees and expenses and costs of suit.

## **JURY DEMAND**

Plaintiffs demand a trial by jury of all issues so triable.

**[Attorney Signature Blocks on Subsequent Page]**

Dated: April 18, 2025.                  Martha A. Geer (NY Reg. No. 1917129)
                                         **MILBERG COLEMAN BYRSON PHILLIPS**
                                         **GROSSMAN, PLLC**
                                         900 W. Morgan Street
                                         Raleigh, NC 27603
                                         Telephone: (206) 623-7292
                                         Email: mgeer@milberg.com

                                         */s/ Martha A. Geer*_____
                                         Martha A. Geer

                                         *and*

                                         Mark Silvey (TN Bar No. 013415)*
                                         Robert R. Jimenez (NY Reg. No. 5814249)*
                                         Jordan Macejka (FL Bar No. 123599)*
                                         **MILBERG COLEMAN BRYSON PHILLIPS**
                                         **GROSSMAN, PLLC**
                                         201 Sevilla Avenue, 2nd Floor
                                         Coral Gables, FL 33134
                                         Telephone: (786) 879-8200
                                         Facsimile:  (786) 879-7572
                                         msilvey@milberg.com
                                         rjimenez@milberg.com
                                         jmacejka@milberg.com
                                         Secondary Email: ajaramillo@milberg.com

                                         *Application for *pro hac vice* forthcoming

                                         *Attorneys for Plaintiffs*